**HANCOCK MFG. CO. v. UNITED STATES.**

No. 10028.

Circuit Court of Appeals, Sixth Circuit.

May 29, 1946.

Benj. Kleinstiver, of Jackson, Mich. (Kleinstiver & Anderson, of Jackson, Mich., on the brief), for appellant.

Colin A. Smith, of Chicago, Ill., and Morris Zwerdling, of Detroit, Mich. (John C. Lehr and Morris Zwerdling, both of Detroit, Mich., and Colin A. Smith, of Chicago, Ill., on the brief), for appellee.

Before HICKS, ALLEN, and MARTIN, Circuit Judges.

HICKS, Circuit Judge.

An information containing eighteen counts was filed against Hancock Manufacturing Company (herein called Hancock) which charged that on eighteen occasions between October 31 and December 22, 1941, it "unlawfully did knowingly solicit, accept and receive a concession" from a carrier in violation of Sec. 322(c) of Title 49 U.S.C.A. Each count charged that the carrier did transport on the public highways from Toledo, Ohio to Jackson, Michigan, for Hancock, a specified number of pieces of "automobile body parts, sheet iron or steel not otherwise indexed in the governing classification" consigned from the City Auto Stamping Company, and that thereafter on a specified day "at Jackson, Michigan, said carrier did charge, collect and receive from defendant * * * and defendant did pay for such transportation compensation * * * less than the charge and compensation . * * * specified therefor in said tariff. * * *"

Appellant waived a jury and the court, denying a motion to dismiss made at the close of the evidence, adjudged it guilty

and imposed a fine of $50 on each count, although it concluded that there was no evidence of an elaborate operation or that appellant was engaged in such unlawful conduct for any great period of time.

The evidence showed that Hancock, whose plant was located at Jackson, Mich., had been engaged in the stamping industry since 1906. One of its customers was Chrysler, for whom it contracted to manufacture a hood hinge,—an assembly of two hinge plates with other parts—which was designed to function as a joint to raise and lower the engine hood of an automobile. There was a right hinge and a left hinge, one plate of each hinge being attached to the underside of the hood and the other to the cowl of the car.

The evidence showed that Hancock first punched the metal for the plates, and certain reinforcing parts, out of a flat piece of steel in a stamping or punching operation, and then shipped these flat blanks to City Auto Stamping Company in Toledo for further forming and piercing operations, because its own presses were not large enough for the purpose. After these forming and piercing operations were performed the City Auto Stamping Company then spot welded the small reinforcing parts to the larger hinge plates, after which the unfinished plates with the reinforcing parts welded thereto were shipped back to Hancock in the shipping movements, the charges for which are challenged in this information, for additional piercing and finishing operations and assembly into the completed hinge.

Physical Exhibits 21 and 22 were in evidence, as illustrative of the plates and the reinforcing parts which had been welded thereto.

The reference to stampings in National Motor Freight Classification No. 5, issued by C. F. Jackson, Agent, November 25, 1940, in which the two carriers who hauled these plates from Toledo to Jackson were participants and found as item "12" under "Iron or Steel" at page 265, is as follows:

"Blanks, Stampings or unfinished Shapes, N. O. I., from plate or sheet iron or steel, see Note 5 below, in the rough (blanks, stampings or unfinished shapes in one piece, not further finished except that they be primed, leaded or tarred with one coat only, to preserve them from rust) :"

Then followed certain immaterial matter as to weight, packaging, nesting, etc. Note 5 stated in part:

"Where Blanks, Stamping or Shapes require no further work before becoming finished articles, or where they have been further finished than in the rough by mechanical process or by being bronzed, coppered, acid coppered, enameled, galvanized, japanned, painted, plated, tinned, or coated by any other process the general or specific description for the article must be used. * * *"

In the Motor Freight Tariff, issued January 27, 1941, by Central States Motor Freight Bureau, Inc., Agent, dealing with Articles of Iron or Steel Manufacture, in which both carriers participated, the following notation occurred after the headings, "Blanks" and "Stampings":

"N. O. I., from Plate, Sheet or Strip, in one piece, not advanced in the state of manufacture beyond the stamping process and which require further work before becoming finished articles. Articles may be leaded, painted or tarred with one coat only, to preserve from rust;".

The alternative to the classification of these plates as stampings was as "Automobile body parts, sheet iron or steel, N. O. I." or as "automobile parts, N. O. I." in the National Freight Classification No. 5, although the shipper would naturally use the "body parts" classification since the rate thereunder was the cheaper of the two. However, the stamping rate was, roughly, 40% lower even than that for body parts.

The case turns narrowly upon whether these plates with small reinforcing pieces welded to them for strength were "blanks, stampings or unfinished shapes *in one piece* not further finished," and were *"in one piece, not advanced in the state of manufacture beyond the stamping process."* (Italics ours.)

The Government introduced the testimony of a number of witnesses of unexceptionable reputation, who were versed in rail classification and rating work. One of these was Walter Pinninger, who had

been for twenty-five years District Manager of the Central Inspection and Weighing Bureau, on behalf of rail carriers in the Central Freight Association Territory. He was of the opinion that these plates were not stampings because they were not one piece but with the welded reinforcements constituted "an assembly of three pieces." The other plate with one reinforcement part welded to it, he deemed "an assembly of two parts." He pointed out that item "12" called for a plate or stamping "in one piece." He was of the opinion that these plates were "automobile body parts."

Another witness was Donald D. Isbell, for more than twenty-five years tariff and rate analyst of the Interstate Commerce Commission. He was asked:

"From your experience in construing and interpreting tariffs * * * is Government's Exhibit 21 a stamping within the provisions of that item?

His answer was,

"No sir * * * because it is reinforced by the addition of welded parts to it."

Of Exhibit 22 he said that it had been "Reinforced by welding process of an additional part welded to it. It is not a stamping in one piece and it is further finished than a stamping."

George L. Bower, rate agent and former tariff examiner with the Interstate Commerce Commission, testified,

"From my experience, Government's Exhibit 21 cannot be classified as a stamping because it really consists of three stampings, one large stamping with two smaller stampings welded to it."

On cross-examination he stated that for tariff and classification purposes, he considered these to be automobile body parts.

Loomis L. Bunker, terminal manager of the Roadway Express and formerly traffic manager for Andrews Truck Line, one of the two carriers transporting the questioned parts, was of the opinion that Exhibit 21 "was further finished than a stamping," because of the pieces welded on to it.

On the other hand defendant's Vice-President and General Manager testified

that in the stamping industry, the term, "finished stamping" referred to the surface finish put upon the stamping; and this would still be considered a stamping because the welding was only incidental to the stamping process. "Those three pieces originally were three stampings. They have been put into one piece by spot welding." He was of the opinion that a "body part" would be construed as "a part of the body" of an automobile, that "in manufacturing vernacular there is a hood and there is a body."

Bernard J. Clark, who was in the automobile repair and collision business, whose firm handled around 4000 wrecked automobiles a year, and who professed to be familiar with the classification of the various parts of an automobile, stated that the hood of a car (for which these stampings were intended) was not classified as a body part in any manufacturer's parts book that he had looked through. To look up a hood hinge, he testified he would look under the "hood group."

W. J. Maguire, works manager of the Jefferson plant of the Chrysler Corporation, who had previously been six years in its production department and seven or eight years in the planning department, and who in those years had "become familiar with the terms used as to various parts of the automobiles and the classification thereof," testified "that the hood is not considered a part of the body of the car and to his knowledge had never been so designated in the automobile industry." However, on cross-examination, he admitted he had no knowledge of the classification of different parts of an automobile, including a hood hinge, under the National Motor Freight Classification.

Leo Henning, purchasing agent for the defendant, who had been with that firm since 1923 and had worked in the planning department, testified from his experience, parts like Exhibits 21 and 22 had "never been designated or classified as body parts," that in terms of the stamping industry they would be termed "rough stampings." He testified that these parts were not connected with the body, would eventually be a "hinge assembly," and at the stage of

manufacture at which they were shipped they were an "unfinished stamping." He admitted however on cross-examination, that these would be denoted stampings in the processing or metal trades, and that technically he was not referring to their classification for purposes of shipping.

Ivan Snyder, owner and operator of a truck line, who had had experience with tariffs, classifications and rates with the Michigan Interstate Motor Tariff Bureau, testified that he considered this a stamping on the basis of his interpretation of classification and tariff provisions, and based that interpretation on the fact that the exhibits were in one piece, not further finished and in the rough; that the two exhibits represented the welds of two and three parts into one. He admitted that he was not "too familiar with the stamping business" and did not know "whether welding is a stamping process."

Harry F. Meyers, chief of the tariff department of the Liberty Highway Company, insisted that this was a stamping, although he admitted his incompetency to state whether a weld made the pieces into one or two. He admitted also that he was no automobile engineer, and based his interpretation on the transportation angle and not on the actual use of the automobile.

Rollo Markle, chief engineer of defendant, testified that the term "finish," in the stamping industry was understood to mean the treatment of the surface by some mechanical process for preservation of the surface.

The difficulty, attending a judgment on the issue made, is highlighted by the fact that the Government's first witness, Joseph Howard, chief engineer and sales manager of the City Auto Stamping Company, testified on cross-examination that Exhibit 21 had no finish or plating, no rust-proofing on it, that it was just as it came from the stamping presses with the exception of the two small pieces which were welded on to it in a separate process; that it was not an automobile body part and had no connection with a body function, except as the point of fixation for the assembled hood hinge. He pointed out, however, that the blue print (Government's Exhibit 19)

called it "Plate hood hinge-body half." Exhibit 22, he testified, was not an automobile body part, that "In his twenty-five years' experience I have never heard of its being so considered * * * it is another part which when completed would be assembled into the hood hinge." He reiterated that Exhibits 21 and 22 were still stampings, that further stamping operations were to be performed upon them, that both were in the rough, that there was no finish of any kind on them, no solution or application of any kind to rustproof or preserve them. However, on re-direct, he stated that he was unfamiliar with the definitions of stampings for the purpose of shipping, and when he spoke of it as a stamping, he didn't consider it from the vernacular of tariffs with which he was unfamiliar.

The same contradiction in the Government's witnesses appeared in witness Catlin, who was the traffic manager of City Auto Stamping Company. On cross-examination, he testified that he considered the articles were stampings, that after checking with the engineering department, he decided they were not body parts.

The District Court entered a verdict of guilty but made no findings of fact or conclusions of law, other than the determination "from the evidence * * * that defendant is guilty."

The court of course concluded that Hancock was guilty beyond a reasonable doubt, otherwise there could have been no judgment. To support the verdict, the evidence must show beyond a reasonable doubt that appellant shipped automobile body parts as stampings and paid the lower rate carried by "stampings." This involves the critical question, whether the articles shipped constituted stampings. The court must have concluded that they did and must have drawn this inference from the testimony of the Government's witnesses. In our view another judge or other judges upon the same record might with reason have believed appellant's witnesses and have arrived at a contrary result and thus we would have the anomaly of convictions or acquittals upon the same record, the result depending upon the par-

ticular judge's viewpoint as to what constitutes stampings. Further, another or other sets of witnesses testifying upon the same subject in other cases might with reason and intelligence entertain varying opinions on the subject.

The difficulty here is that it is manifest from the evidence that the word "stampings" is indefinite and uncertain in its meaning and "fixes no immutable standard" which a court may recognize as a matter of law. See United States v. Cohen Groc. Co., 255 U.S. 81, 87, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045. In an ordinary case this might be done. See Boone v. United States, 6 Cir., 109 F.2d 560, 562.

But we are here impressed with the peculiar character of the evidence and of the problem of interpretation presented in deciding, whether Exhibits 21 and 22 were "stampings," which they clearly were but for the addition of the welded parts. The court obviously could not be assisted by reference to a dictionary, or to popular usage or understanding, for the meaning of the term. The tariff was not clear whether an otherwise plain stamping ceased to be a stamping, because it had small parts welded to it for strength; or whether the same plate with parts welded to it continued to be a stamping because its surface was not painted or otherwise treated to prevent rust, and because a further stamping or piercing operation remained to be done upon it. And when the welding operation cast doubt upon its rating as a stamping, and it did not obviously become an "automobile body part" because automotive engineers and parts men testified that it was not technically a "body part," but more accurately a hinge or hood part.

Further, in our view the word "stampings" used in the tariffs did not even present a question of fact of the kind usually left with a jury. In reality it presented a question of fact the determination of which in a civil case has been adjudged to lie with a body of experts. In Great Northern R. Co. v. Merchants Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 479, 66 L.Ed. 943, the Supreme Court rejected the contention that courts are without jurisdiction in cases involving a disputed question of construction of an interstate tariff, stating the familiar rule that the construction to be "given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute." But, quoting further:

"When the words of a written instrument are used in their ordinary meaning, their construction presents a question solely of law. But words are used sometimes in a peculiar meaning. * * *

"It may happen that there is a dispute concerning the meaning of a tariff which does not involve, properly speaking, any question of construction. The dispute may be merely whether words in the tariff were used in their ordinary meaning, or in a peculiar meaning. This was the situation in the American Tie & Timber Case, supra [Texas & Pacific Ry. Co. v. American Tie & Timber Co., 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255]. The legal issue was whether the carrier did or did not have in effect a rate covering oak ties. The only matter really in issue was whether the word 'lumber' which was in the tariff, had been used in a peculiar sense. The trial judge charged the jury: 'If you believe from the evidence that oak railway cross-ties are lumber within the meaning and usage of lumber and railroad business, then you are charged the defendant had in effect a rate applying on the ties offered for shipment.' This question was obviously not one of construction; and there is not to be found in the opinion of the court, or in the proceedings in either of the lower courts, a suggestion that the case involved any disputed question of construction. *The only real question in the case was one of fact; and upon this question of fact 'the views of men engaged in the lumber and railroad business as developed in the testimony' were in 'irreconcilable conflict.'* * * * As that question, unlike one of construction, could not be settled ultimately by this court, preliminary resort to the Commission was necessary to insure uniformity. * * *"* (Italics ours.)

Although that was a civil case, we think it clearly supports our conclusion here, that the evidence as presented is not sufficient

to support a verdict of guilty beyond a reasonable doubt. Upon the evidence here, we are no more able correctly to construe or interpret the term "stampings" than was the Supreme Court to settle by construction a freight tariff in the Great Northern case. Moreover, in federal jurisprudence, there is no such thing as a constructive offense. We have repeatedly pointed out that a citizen cannot be construed into jail. Before one can be punished it must plainly appear that he has violated the law or some classification or tariff authorized by lawful authority and binding upon him by force of law.

For the reasons indicated, the judgment appealed from must be reversed, not only upon the ground that the word "stampings" is too vague and indefinite, but that the evidence submitted is insufficient to support a verdict beyond a reasonable doubt. We regard it as unnecessary to consider and pass upon other questions presented in the record.

Reversed.